UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD JERRELL INMAN,<br><br>Plaintiff,<br><br>v.<br><br>S. HATTON, et al.,<br><br>Defendants. | Case No. 17-cv-06612-SI<br><br>**ORDER OF DISMISSAL WITH LEAVE TO AMEND**<br><br>Re: Dkt. No. 1 |

Ronald Jerrell Inman, an inmate at the Correctional Training Facility in Soledad, filed this *pro se* civil rights action under 42 U.S.C. § 1983 to complain about his urine tests at the prison. His complaint is now before the court for review under 28 U.S.C. § 1915A.

**BACKGROUND**

The California Department of Corrections and Rehabilitation's Operations Manual has provisions regarding urinalysis for inmates. Certain procedures must be followed during the collection of a urine sample. Among the procedures required are the following:

- Staff must "[c]learly observe the flow of urine into the bottle."

- "If the inmate is unable to provide a urine sample, the inmate shall be offered eight ounces of water to assist in providing a urine sample. The inmate shall also be allowed up to three hours, under staff observation, to provide a urine sample."

- "Inmates who refuse or are unable to provide a urine sample shall be subject to disciplinary action in accordance with CCR 3323(h)(5). If an inmate is unable to provide 20 cc of urine, within this time period, this shall be presumed a refusal. An inmate may rebut this presumption during the disciplinary process."

-"Reasonable accommodation shall be afforded to inmates with disabilities to facilitate their full participation in drug and/or alcohol testing as provided in these rules."

CDCR Operations Manual § 52010.18 (attached as Exhibit C to Complaint).

The complaint alleges the following:

On February 14, 2017 Inman submitted a request for medical care because he had diarrhea.

Later that day, Inman was instructed to provide a urine sample for a random urinalysis ("UA"). He attempted to provide a urine sample "but began to defecate once he relaxed" because he had diarrhea that day. Docket No. 1 at 3-4. He explained his situation to correctional officer (C/O) Martinez, who was observing the urine test, and asked permission to sit down on the toilet to avoid defecating on himself. Martinez refused to let him sit, stating that "'all inmates must stand to do a UA.'" *Id.* at 4. Martinez was rude to Inman and, while standing at Inman's elbow and "staring at [Inman's] exposed penis, yelled, 'Are you going to go, are you going to go, are you going to go?'" *Id.* Inman explained again that "his body wouldn't allow him to urinate due to having diarrhea." *Id.* Martinez then said Inman could try again later. More than an hour later, Inman again tried to urinate as ordered but again could not do so without beginning to defecate. Martinez again refused to let him sit down and, "while staring at his exposed penis," yelled, "'Are you going to go, are you going to go, are you going to go?'" *Id.* Inman attempted to urinate but "also began passing gas and releasing his watery bowels at which time Martinez yelled, 'stop! stop! stop! I'm giving you a 115!'" *Id.* Inman protested that he still had two hours in which to provide a urine sample.

After cleaning himself, Inman talked to sergeants Gregory and Gracey to tell them about his diarrhea and inability to provide a urine sample without sitting down. The sergeants were unreceptive and said that inmates had to stand to provide a urine sample. Inman filed a staff complaint about C/O Martinez "for sexual misconduct, for forcing [Inman] to defecate on himself and for failing to follow written rules regarding U.A. tests." *Id.* at 5

The next day, Inman went to the medical clinic and was prescribed Imodium.

Inman received a rules violation report (also known as a CDC-115) for refusing to provide a urine sample on February 14. *Id.* On February 24-25, 2017, a hearing was held on the rule violation report. Inman urged in his defense that he had been unable to produce a urine sample due to his diarrhea, that he should have been given a "reasonable accommodation" to provide the

2

urine sample, and that there was no rule requiring inmates to stand for urine tests. *Id.* at 5-6. Hearing officer Gomez said that it did not matter what the written rules said, "'it's our rule that all inmates must stand on their feet to do a U.A. and as far as diarrhea is concerned, it is not a disability.'" *Id.* at 6. Inman was allowed to pose some questions (through the hearing officer) to C/O Martinez, who was present at the hearing. Martinez changed the time on the rule violation report to reflect that three hours had elapsed during the urine test. *Id.* at 6. Inman asked to call two witnesses: he wanted a nurse to testify about her "diarrhea diagnosis" and inmate Peterson to testify as to the time Inman first was informed that he had a urine test. *Id.* Hearing officer Gomez declined and stated, "'I've already found you guilty so they won't do you any good, so no!'" *Id.* Inman later filed an appeal after he received the hearing decision that had found him guilty.

When Inman discussed his complaint about Martinez's conduct during the urine test with lieutenant Mak on February 24, 2017; lieutenant Mak laughed at him. On March 24, 2017, lieutenant Mak interviewed him for his staff complaint about Martinez and "reiterated that he thought what Martinez did was comical." *Id.* at 9.

On April 4, 2017, Inman was ordered to provide another urine sample. He was taken to the same restroom in which "Martinez had assaulted him on February 14, 2017. While attempting to urinate, [Inman] began experiencing a rapid heartbeat, uncontrollable shaking and sweating which caused him not to be able to urinate with [C/O] Jones standing next to him and staring at his exposed penis." *Id.* at 6-7. He told Jones of his problem, and Jones told him to return after dinner to try again. Inman tried several more times, but experienced the same symptoms and was unable to urinate. C/O Jones called him a "'mental case'" and told him to leave, even though Inman protested that his three-hour time period had not expired. *Id.* at 7.

Inman received a rule violation report charging him with refusing to provide a urine sample on April 4. On April 15, 2017, lieutenant Mak conducted the hearing for the rule violation report written by C/O Jones. Inman urged in his defense that he had not been provided three hours under staff observation, that a mental health assessment was required because the correctional officer had called him a mental case, that Mak might have a conflict of interest because he also had reviewed Inman's complaint about Martinez's conduct in the February 14 urine test, and that

3

Inman was not guilty. *Id.* at 9-10. Lieutenant Mak rejected Inman's several defenses. Inman later filed a staff complaint against lieutenant Mak. Attached to the complaint is a copy of the documentation from the April 15, 2017 disciplinary hearing for the April 4, 2017 incident. Complaint, Ex. O. In that documentation, the hearing officer wrote that he found Inman guilty of refusing to provide a urine sample for testing of controlled substances, and explained the basis for his decision, i.e., the information in the rule violation report, Inman's incriminating statements at the hearing, and Inman's plea of guilty with an explanation (i.e., that Inman could not urinate as directed because he "just freaked out"). *Id.* at 5.[1]

Inman submitted a request on April 5, 2017 to talk to his mental health practitioner due to his experiences during the urine test. A psychologist diagnosed him with paruresis, or shy bladder syndrome, "due to the trauma he experienced when Martinez forced him to defecate on himself and committed sexual misconduct," and gave him a handout on April 24, 2017. Docket No. 1 at 8.

C/O Jones ordered Inman to provide urine samples on at least two more occasions. On September 19, 2017 and again on October 3, 2017, Inman was unable to urinate at first, but eventually filled the sample vial. *Id.* at 8-9. Inman was displeased that Jones wanted him to urinate on Jones' schedule, rather than at the moment Inman was ready to do so -- the differences being 25 minutes or less between when Inman wanted to urinate and Jones allowed him to urinate for the tests. It is "obvious" to Inman that Jones "is forcing him to urinate only when Jones wants him to which is in retaliation and/or a reprisal" due to Inman filing an inmate appeal against Jones. *Id.* at 9.

Inman filed a request for reasonable accommodations, seeking a blood draw instead of a urine test "due to being traumatized to the point of not being able to urinate with a C.O. standing next to him and being diagnosed with paruresis." *Id.* at 10. His request was denied, as was his

---

[1] Although Inman was not successful in his defense, he points out that some other inmates were not disciplined for failing to provide a urine sample: one inmate was not disciplined because the time on the rule violation report was incorrect, and another inmate was not disciplined because he had a medical condition (i.e., recent surgery, followed by antibiotics for an infection) which prevented him from providing a urine sample. *See* Docket No. 1 at 12, Complaint, Exs. U, V.

4

appeal of the decision. *Id.* The response to his request stated that "there is no medical evidence in the reviewed records to suggest an identifiable medical condition that would necessitate a medical investigation." Complaint, Ex. Q. The director's level decision on his inmate appeal stated, in part, that random drug testing was not a health care issue, that "health care staff do not have jurisdiction over custody staff," and that Inman should address his concerns regarding urinalysis procedures though "the appropriate custody channels at" his prison. Complaint, Ex. R.

Correctional captain Chamberlain failed to order his staff to comply with all the written rules and regulations. Docket No. 1 at 10. Chamberlain also failed to respond to Inman's requests for information and to suspend his punishment while he pursued his inmate appeals. *See id.,* Complaint, Ex. S.

Warden Hatton and chief of appeals Vong were complicit in the actions of all the staff "due to signing their names to one or all of the denials of the staff complaints/appeals filed." Docket No. 1 at 11.

Inman "was ordered to perform two U.A. tests in a 12-day period, February 2 and 14, 2017." *Id.* at 12. He questions why he received two random tests in 12 days, when there are 1200 other inmates at the facility. *Id.* at 12. (Urine tests were not new to Inman, as suggested by his comment in an attachment to his complaint that he "had been required to do more than a dozen" urine tests over the past couple of years. Complaint, Ex. B.)

As a result of the disciplinary decisions, Inman lost pay from his work assignment for six months, lost visiting privileges for six months, lost his "entertainment appliances" and "programs" for 90 days, was confined to his cell for five days. Docket No. 1 at 13. Inman also is now required to provide urine samples on a monthly basis. *Id.* The disciplinary decisions indicate that he also lost time credits.[2]

---

[2] The loss of time credits often suggests that the claims need to be asserted in a petition for writ of habeas corpus rather than a civil rights complaint. If success in the action will affect the duration of the inmate's confinement, the claim must be pursued in a habeas action. *See Nettles v. Grounds*, 830 F.3d 922, 932 (9th Cir. 2016) (en banc). Inman has been in custody for more than a decade serving a sentence of 61 years to life for sex offenses against several children. *See People v. Inman*, 2004 WL 147256 (Cal. Ct. App. 2004). Due to his indeterminate life sentence, success in this action would not necessarily affect the duration of his confinement. His claims are properly brought in a civil rights action.

**DISCUSSION**

A federal court must engage in a preliminary screening of any case in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity. *See* 28 U.S.C. § 1915A(a). In its review the court must identify any cognizable claims, and dismiss any claims which are frivolous, malicious, fail to state a claim upon which relief may be granted, or seek monetary relief from a defendant who is immune from such relief. *See id.* at § 1915A(b)(1),(2). *Pro se* pleadings must be liberally construed. *See Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two elements: (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the violation was committed by a person acting under the color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

<u>Fourth Amendment</u>: Requiring inmates to provide urine samples for random mandatory drug testing, and non-random drug testing that is not intended to harass an inmate, are reasonable under the Fourth Amendment. *Thompson v. Souza*, 111 F.3d 694, 702 (9th Cir. 1997). A urine test must be done in a reasonable manner. *Id.* Of particular relevance here, *Thompson* upheld against a Fourth Amendment challenge a urine test that conducted in a bathroom stall with a damp floor where only plaintiff and the prison official were present, and where the guard "stood within eight inches of [the inmate's] side and continuously watched [the inmate] urinate into a small plastic bottle." *Id.* at 702. The Ninth Circuit determined that the "presence of the guard was reasonable to safeguard the integrity of the test and to maintain control over the prisoner." *Id.*

The complaint does not state a claim for a Fourth Amendment violation. Subjecting Inman, or any other inmates, to random urine tests did not violate the Fourth Amendment. And he has not stated a claim based on a search conducted in an unreasonable manner. The allegations that C/O Martinez stared at Inman's penis and repeatedly yelled, "are you going to go?" as Inman attempted to urinate do not state a claim for a Fourth Amendment violation. As in *Thompson*, there was no touching by Martinez, and his close proximity was necessary to safeguard the integrity of the test by actually watching the inmate produce the sample. Requiring Inman to stand

6

1 and urinate into a bottle while being observed by a guard did not result in a Fourth Amendment violation.

Inman's allegation that he thinks the urine tests were not random because he had two in 12 days does not state a claim. The mere fact that he had two tests in twelve days does not plausibly show that they were not random. In any event, non-random urine tests not intended to harass the inmate do not violate the Fourth Amendment. *See* Thompson, 111 F.3d at 702.

Sexual assault: A prisoner may state an Eighth Amendment claim under § 1983 for sexual harassment if the alleged sexual harassment was sufficiently harmful, i.e., a departure from "the evolving standards of decency that mark the progress of a maturing society," and the defendant acted with intent to harm the prisoner. *See Thomas v. District of Columbia*, 887 F. Supp. 1, 3-4 (D.D.C. 1995) (citing *Hudson v. McMillian*, 503 U.S. 1, 6, 8 (1992)) (internal quotations and citation omitted). Sexual assault, coercion and harassment certainly may violate contemporary standards of decency and cause physical and psychological harm, *see Jordan v. Gardner*, 986 F.2d 1521, 1525-31 (9th Cir. 1993) (en banc), but not every malevolent touch by a prison guard or official gives rise to an Eighth Amendment violation - the Eighth Amendment's prohibition against cruel and unusual punishment necessarily excludes from constitutional recognition de minimis uses of force. *See Hudson*, 503 U.S. at 9-10; *Watison v. Carter*, 668 F.3d 1108, 1112-14 (9th Cir. 2012) (no 8th Amendment violation against officer who was alleged to have rubbed his thigh against plaintiff's thigh while plaintiff was on toilet and to have begun smiling before leaving cell laughing). A prisoner therefore must establish that the alleged sexual harassment was egregious, pervasive and/or widespread in order to state a claim under the Eighth Amendment. *See, e.g., Jordan*, 986 F.2d at 1525-31 (prison policy requiring male guards to conduct body searches on female prisoners).

Inman alleges that Martinez sexually assaulted him. The described conduct -- staring at Inman's penis during the urine test -- simply does not amount to a sexual assault. Direct observation of the inmate as he provides a urine sample is required as a matter of CDCR policy: a staff member must "[c]learly observe the flow of urine into the bottle." CDCR Operations Manual § 52010.18; *cf. Thompson*, 111 F.3d at 702 (recognizing appropriateness of having direct

7

observation of the inmate by the guard during the testing). *See also Watison*, 668 F.3d at 1113 ("[t]he 'humiliation' Watison allegedly suffered from the [unwanted approach and touching by the guard] does not rise to the level of severe psychological pain required to state an Eighth Amendment claim").

Verbal harassment: Verbal harassment alone is not actionable under 42 U.S.C. § 1983. *See Freeman v. Arpaio*, 125 F.3d 732, 738 (9th Cir. 1997), *overruled in part on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884-85 (9th Cir. 2008); *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987) (directing vulgar language at prisoner does not state constitutional claim); *Burton v. Livingston,* 791 F.2d 97, 99 (8th Cir. 1986) ("mere words, without more, do not invade a federally protected right").

Martinez's alleged yelling at Inman during the urine test may have been counterproductive, but it certainly did not amount to a constitutional violation.

Retaliation: "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted).

Inman contends that, during two urine tests in September and October, C/O Jones would not let Inman urinate when Inman wanted to urinate and instead made Inman urinate on Jones' schedule as retaliation for Inman filing an inmate appeal against Jones. A plausible retaliation claim is not stated for several reasons. First, the requirement that the inmate provide a urine sample reasonably advanced a legitimate correctional goal of deterring use of alcohol and drugs in prison, so the urine test in general was not retaliatory. Second, the alleged retaliatory conduct -- making the inmate wait up to 25 minutes to provide a urine sample when the guard was ready rather than when the inmate wanted to urinate -- would not chill or silence a person of ordinary firmness from future First Amendment activities. *See Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999) ("the proper inquiry asks 'whether an official's acts

8

would chill or silence a person of ordinary firmness from future First Amendment activities.'"). Third, Inman does not allege any facts that plausibly suggest that C/O Jones engaged in the allegedly retaliatory conduct *because of* Inman's protected conduct -- his allegations only show that the allegedly retaliatory conduct followed several months after Inman filed a grievance against C/O Jones. *See Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (retaliation claim cannot rest on the logical fallacy of *post hoc, ergo propter hoc*, i.e., "after this, therefore because of this").

Eighth Amendment: The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993). The Eighth Amendment imposes duties on prison officials to provide prisoners with the basic necessities of life, such as food, clothing, shelter, sanitation, medical care, and personal safety. *See Farmer*, 511 U.S. at 832. A plaintiff alleging that conditions of confinement amount to cruel and unusual punishment prohibited by the Eighth Amendment must satisfy a two-prong test. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). First, a plaintiff must satisfy an objective test showing that "he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. In determining whether a deprivation of a basic necessity is sufficiently serious to satisfy the objective component of an Eighth Amendment claim, courts consider the circumstances, nature, and duration of the deprivation. *See Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000). Second, the plaintiff must show that the prison official inflicted the deprivation with a "sufficiently culpable state of mind," that is, with "deliberate indifference" to his health or safety. *Farmer*, 511 U.S. at 834. The deliberate indifference standard requires that the official know of and disregard an excessive risk to inmate health or safety. *See id.* at 837. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *See id.*

The allegations of the complaint do not state a claim for an Eighth Amendment violation, as both prongs of an Eighth Amendment claim are missing. Being required to stand for a urine

9

test, even when that inmate is experiencing diarrhea, does not amount to an objectively serious condition. Being required to urinate for a urine test in front of the watchful eyes of a guard, even for an inmate with a shy bladder, also does not amount to an objectively serious condition. Although the Eighth Amendment protects against cruel and unusual punishment, this does not mean that federal courts can or should interfere whenever prisoners are inconvenienced or suffer de minimis injuries. The alleged conditions of the urine tests and Inman's problems producing urine samples are in the category of inconveniences and de minimis injuries that do not rise to the level of an objectively serious condition for Eighth Amendment purposes. *See, e.g., Anderson v. County of Kern*, 45 F.3d 1310, 1314-15 (9th Cir.) *amended*, 75 F.3d 448 (9th Cir. 1995) (temporary placement in safety cell that was dirty and smelled bad did not constitute infliction of pain); *Hernandez v. Denton*, 861 F.2d 1421, 1424 (9th Cir. 1988) (allegation that inmate slept without mattress for one night is insufficient to state 8th Amendment violation and no amendment can alter that deficiency), *judgment vacated on other grounds*, 493 U.S. 801 (1989); *DeMallory v. Cullen*, 855 F.2d 442, 444 (7th Cir. 1988) (correctional officer spitting upon prisoner does not rise to level of constitutional violation); *Holloway v. Gunnell*, 685 F.2d 150 (5th Cir. 1985) (no claim stated where prisoner forced to spend two days in hot dirty cell with no water); *Curry v. Morring*, 2010 WL 3490238, at *2 (N.D. Cal. 2010) (no Eighth Amendment claim stated by inmate who defecated on himself after correctional officers refused to let inmate leave exercise yard and return to his cell to use a toilet with toilet paper). Moreover, the allegations of the complaint do not plausibly suggest that, in demanding urine samples, Martinez and Jones acted with deliberate indifference to Inman's health and safety, i.e., that they knew of and disregarded an excessive risk to his health or safety. *See Farmer*, 511 U.S. at 837.

Due Process: A prisoner is entitled to due process before being disciplined when the discipline imposed will inevitably affect the duration of his confinement or "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484, 487 (1995). The discipline allegedly imposed on Inman -- loss of time credits, loss of a prison job, and loss of certain privileges for several months -- presumably gives rise to a federally-protected right to due process.

10

Identifying a constitutionally-protected liberty interest is only the first step; the prisoner also must identify the procedural protections not provided to him when he was deprived of that constitutionally-protected liberty interest to state a claim. The procedural protections required in a prison disciplinary proceeding include written notice, time to prepare for the hearing, a written statement of decision, allowance of witnesses and documentary evidence when not unduly hazardous, and aid to the accused where the inmate is illiterate or the issues are complex. *See Wolff v. McDonnell*, 418 U.S. 539, 564-67 (1974). There also must be some evidence to support the decision, *see Superintendent v. Hill*, 472 U.S. 445, 454 (1985), and the information that forms the basis for prison disciplinary actions must have some indicia of reliability, *see Cato v. Rushen*, 824 F.2d 703, 704-05 (9th Cir. 1987). The Due Process Clause only requires that prisoners be afforded those procedures mandated by *Wolff* and its progeny; it does not require that a prison comply with its own, more generous procedures. *See Walker v. Sumner*, 14 F.3d 1415, 1419-20 (9th Cir. 1994), *overruled on other grounds by Sandin*, 515 U.S. 472.

Inman appears to challenge the sufficiency of the evidence to support the disciplinary decisions. This is an instance in which a prisoner-plaintiff has pled himself out of a claim, as his complaint and attachments show that there was sufficient evidence for the disciplinary decisions to withstand his constitutional challenge. On both occasions, he was found guilty of violating section 3290(d) of title 15 of the California Code of Regulations, which provides: "Inmates must provide a urine sample when ordered to do so pursuant to these regulations, for the purpose of testing for the presence of controlled substances or the use of alcohol." Complaint, Exs. I and O. On both occasions, the hearing officer gave a written statement of his decision, and the written statement shows that there was sufficient reliable evidence to support the disciplinary decisions. "[T]he requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits. . . . Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Superintendent v. Hill*, 472 U.S. at 455 (1985) (internal citations omitted).

There was some evidence to support the disciplinary decision for the February 14 incident, as the documentation attached to the complaint shows. Complaint, Ex. I. The hearing officer provided a written explanation of his reasons for finding Inman guilty by a preponderance of the evidence. *Id.* at 6-8. The hearing officer explained why he rejected Inman's defense that he needed to sit down to provide a urine sample: "an inmate attempting to submit a urine sample from a seated position would obstruct the officer's view of urine flow into the collection bottle as the inmate's use of both his hands beneath toilet seat obstructs the officer's view and affords the inmate the opportunity to tamper with the sample by scooping water into collection bottle to contaminate the urine sample." *Id.* at 7. The hearing officer acknowledged that Inman had submitted a health care request form from February 14, 2017, in which Inman noted his main complaint was diarrhea and stomach pains. *Id.* at 8. The hearing officer considered and rejected Inman's defense that his diarrhea prevented him from providing a urine sample, and that he should have been allowed to sit for the urine test. The federal right to due process does not give an inmate a right to have his proffered defense accepted by the hearing officer. The record plainly shows there was some evidence to support the guilty finding: the author of the rule violation report wrote in the report and testified at the hearing that Inman had failed to provide a urine sample on February 14 after having been ordered to provide a urine sample, and Inman had admitted at the hearing that he did not provide a urine sample. The regulation required an inmate to provide a urine sample when ordered to do so, *see* 15 Cal. Code Regs. § 3290(h), and Inman had not done so. Bearing in mind that the federal court does not reweigh the evidence and considers only "whether there is any evidence in the record that could support the conclusion reached" by the hearing officer, *see Superintendent v. Hill*, it is patently obvious that there was more than some evidence to support the disciplinary decision.

There was some evidence to support the disciplinary decision for the April 4, 2017 incident, as the documentation attached to the complaint shows. Complaint, Ex. O. The hearing officer wrote that he found Inman guilty of refusing to provide a urine sample for testing of controlled substances, and explained the basis for his decision, i.e., the information in the rule violation report, Inman's incriminating statements at the hearing, and Inman's plea of guilty with

12

an explanation (i.e., that he "just freaked out" and could not urinate as directed). *Id.* at 5. The record plainly shows there was some evidence to support the guilty finding: the author of the rule violation report wrote in the report that he had ordered Inman to provide a urine sample and that Inman had not provided a urine sample in the allotted time, and Inman admitted at the hearing that he did not provide a urine sample. The hearing officer considered and implicitly rejected Inman's defense that his mental state precluded him from urinating as directed. *Id.* The regulation required an inmate to provide a urine sample when ordered to do so, *see* 15 Cal. Code Regs. § 3290(h), and Inman had not done so. There was sufficient evidence to support the decision.

It also appears that Inman is claiming as separate due process violation that he was denied witnesses at the February 24-25 hearing. He alleges that he was not allowed to call a nurse to talk about her "diarrhea diagnosis" and an inmate to state when Inman was informed he had a urinalysis test. Docket No. 1 at 6. But his complaint indicates that he did not request those witnesses until after he was found guilty, as he alleges that hearing officer Gomez "denied the request stating, 'I've already found you guilty so they won't do you any good, so no!'" *Id.* Also, the form for the hearing reflects that the only witness requested was C/O Martinez, and C/O Martinez appeared at the hearing. Complaint, Ex. I at 4. Although one of the *Wolff* procedural protections is the right to call witnesses, *Wolff* does not require that an inmate be allowed to call witnesses after the hearing is over and the hearing officer has reached his decision.[3]

---

[3] Even if witnesses had been denied in violation of Inman's *Wolff* protections, there is a separate problem regarding the claim. It is plain from the complaint and exhibits attached thereto that Inman did not exhaust administrative remedies for such a claim. "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Section 1997e(a) requires "proper exhaustion" of available administrative remedies. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). Compliance with prison grievance procedures is all that is required by the PLRA to "properly exhaust." *Jones v. Bock*, 549 U.S. 199, 217-18 (2007). The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion. *Id.* at 218. In California, the regulation requires the prisoner "to lodge his administrative complaint on CDC form 602 and 'to describe the problem and action requested.'" *Morton v. Hall*, 599 F.3d 942, 946 (9th Cir. 2010) (quoting Cal. Code Regs. tit. 15 § 3084.2(a)). The inmate appeal Inman filed about the disciplinary decision did not state that he had been denied witnesses at the hearing. Complaint, Ex. J. The inmate appeal instead focused on whether there was a rule that required

<u>Inmate appeals</u>: There is no federal constitutional right to a prison or jail administrative appeal or grievance system for California inmates. *See Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003); *see also Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988); *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996).

Inman had no federal constitutional right to a properly functioning appeal system. An incorrect decision on an administrative appeal or failure to handle it in a particular way therefore did not amount to a violation of his right to due process. Any claims that correctional officials erred in their handling of an inmate appeal, or failed to find in Inman's favor on his several inmate appeals, are therefore dismissed without leave to amend. This includes his allegations that captain Chamberlain failed to respond to his requests for information and to suspend his punishment during his inmate appeals.

<u>Supervisors</u>: Inman alleges that correctional captain Chamberlain failed to make staff do things correctly and that the warden and chief of inmate appeals were complicit in the misdeeds of the staff by virtue of having signed the responses to inmate appeals and complaints. The claims based on the responses to inmate appeals and complaints are dismissed because there is no right to have an inmate appeal decided in any particular way, as explained above. Insofar as Inman is suggesting that these people should be liable because they are in charge of the institution, that theory does not work either. There is no respondeat superior liability under § 1983, i.e. no liability under the theory that one is responsible for the actions or omissions of another, such as an employee. *See Board of Cty. Comm'rs. of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997).

**CONCLUSION**

The complaint fails to state a claim upon which relief may be granted. As it cannot be said with certainty that Inman cannot cure the deficiencies identified in this order, leave to amend is

---

inmates to stand during a urine test, and the alleged "cover-up [that] is in the works." *Id.* at 1, 3. That inmate appeal would not have put prison officials on notice that Inman was complaining that he had been denied witnesses at a disciplinary hearing.

14

granted so that plaintiff may attempt to overcome those deficiencies. Inman must file an amended complaint no later than **April 6, 2018**, and must include the caption and civil case number used in this order and the words AMENDED COMPLAINT on the first page. Inman is cautioned that his amended complaint must be a complete statement of his claims. *See Lacey v. Maricopa County*, 693 F.3d 896, 928 (9th Cir. 2012) (en banc) ("For claims dismissed with prejudice and without leave to amend, we will not require that they be repled in a subsequent amended complaint to preserve them for appeal. But for any claims voluntarily dismissed, we will consider those claims to be waived if not repled.") Failure to file the amended complaint will result in the dismissal of this action.

**IT IS SO ORDERED**.

Dated: March 1, 2018

SUSAN ILLSTON
United States District Judge